GERARD E. LYNCH, *Circuit Judge*, dissenting in part:

The majority opinion today reads into the text of Title VII a loophole that allows companies to engage in precisely the type of discriminatory behavior that the statute was designed to prevent. Per the majority's interpretation of Title VII, companies can avoid liability for discriminatory behavior prohibited by Title VII through the simple mechanism of outsourcing the work of finding employees to outside agencies, even though the *company*, and *not* the outside agency, retains and exercises the ultimate power to decide whether the employee can work for the company. In the present case, it is plausibly alleged that a covered employer demanded of a security agency it had contracted to provide security guards that an employee who had displeased the company on an earlier assignment by complaining of perceived racial discrimination, a quintessential protected activity, not be assigned to work for it on a later occasion when it needed security personnel. When a company that subcontracts a necessary staffing function intercedes in the contracting agency's hiring decisions and asserts its own control over the assignment of workers in a discriminatory manner, it should be held accountable for its actions. The best interpretation of Title VII supports that result, and I therefore respectfully dissent from the majority's disposition of this case.

As frequently occurs when a case is terminated on a motion to dismiss a handwritten complaint from a legally unsophisticated pro se plaintiff, much is murky about the facts that a lawyer or judge might want to know about the present case. It is not clear, for example, whether the plaintiff Sean Felder was a regular employee of AJ Security, the security contractor that sent him to work as a security guard at the 2016 US Open tennis tournament run by defendant USTA, or whether he applied to AJ Security for the very purpose of working at the tournament.[1] But he clearly maintains that USTA delegated the provision of security guards for the tournament to AJ Security, that he sought to work at the US Open, that AJ Security both hired him and assigned him to work at USTA's tournament, and that USTA rejected him, refusing to issue him credentials and sending him back to AJ Security. It is unclear whether AJ Security had other work for him or whether he

---

[1] The tennis tournament is an annual event that runs for several weeks, and draws tens of thousands of spectators, with attendant seasonal security needs. In a number of letters to the district court, Felder talks about filling out an "application" to work at the tournament, and says that AJ Security "hired" him on August 26, 2016, the same day it sent him to pick up his credentials at the offices of USTA. Felder alleges that he had worked security at the US Open on multiple occasions, apparently (at least on some occasions) under the auspices of a different security firm. He alleges that he filed a lawsuit against that firm alleging racial discrimination he claimed to have suffered at the tournament, which resulted in a settlement, leading him to become persona non grata with USTA. Other statements made by Felder can be read as implying that he already worked, or had worked, for AJ Security on other assignments.

2

was interested in working for them other than for the seasonal assignment at the US Open.

I agree with the majority that Felder has neither pled nor proffered concrete facts to support his conclusory allegation that this rejection was based on his race. But he does offer tangible support for his claim that he was rejected by USTA based on his past opposition to perceived racial discrimination in the treatment of security employees at the US Open. He alleges that he obtained a settlement of a previous claim against CSC Security, a security contractor that had previously employed him to work at an earlier iteration of the US Open; that after AJ Security accepted his application to work at the 2016 US Open and sent him to USTA to receive credentials, USTA rejected him as a candidate, refused him credentials, and sent him back to AJ Security; and that Terence Rauls, the AJ Security supervisor who had hired him and sent him to USTA, later told him that USTA rejected him because of his history of protesting alleged discrimination. Those allegations may or may not prove true. But because USTA seeks dismissal of the complaint without even being required to deny them, we must assume them to be true, and the majority opinion does not dispute that these allegations are sufficient

3

to plausibly state a claim that USTA rejected him because of his previous protected activity.

My colleagues nevertheless affirm the dismissal of the complaint on the ground that Felder has not sufficiently alleged that if USTA *had* permitted him to work at its tournament instead of rejecting him at the threshold, USTA would then have been considered his employer under the joint employer doctrine, as that doctrine has been applied by the courts in the context of Title VII conditions of employment cases and other labor-law obligations that apply to persons already hired. Op. at 13.

The majority's opinion rests on a reading of Title VII that makes little sense in the context of a failure-to-hire claim such as Felder's. According to the majority, because an "employer-employee relationship" is "a cornerstone of an adequately pled Title VII complaint," Op. at 3, Title VII requires us to apply "a set of non-exhaustive factors" derived from the common law of agency which "may indicate the existence of an employer-employee relationship under the common law" even where the plaintiff is directly employed by a different party, Op. at 17.

That reasoning is questionable on its face. The very nature of a refusal-to-hire claim implies that the plaintiff does not have an "employer-employee

4

relationship" with the defendant. Such a plaintiff is not complaining that his employer has mistreated him; he is complaining, rather, that he has been denied any chance at employment, because the company controlling the workplace discriminates against *applicants* for work on a prohibited ground.

Nothing in the language of the relevant statute refers to joint employers or otherwise creates any specific rule for claims involving a statutory "employer" that permits or requires a staffing agency to which it delegates the hiring of workers to provide services to it to discriminate against protected categories of applicants when assigning workers to provide those services. Title VII of the Civil Rights Act of 1964, the principal source of the rights Felder claims, makes it unlawful for "employers" to "to fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), or to "discriminate against any . . . applicants for employment . . . because [the applicant] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter," *id.* § 2000e–3(a). The statutory text itself defines "employer" simply as "a person engaged in an industry affecting

5

commerce who has fifteen or more employees . . . and any agent of such a person," other than various federal entities and private clubs. 42 U.S.C. § 2000e(b). The purpose of the definition is to limit the class of individuals and corporations who are subject to federal anti-discrimination legislation, and not to define a required relationship between a statutory "employer" and the party who alleges discrimination.

In the ordinary case, of course, the party alleging discrimination is an employee or an applicant for employment, and so it will ordinarily be the case that an employment relationship between the plaintiff and defendant either exists or is being sought by the plaintiff.

In the modern workplace, employers frequently outsource the provision of services that might once have been performed by persons they directly employ to agencies that specialize in providing particular sorts of workers. Such practices provide numerous benefits to the employer company. As in the case of seasonal work such as that involved in this case, it may be inefficient for the company to recruit, screen and supervise specialized workers who are needed only for a limited (if recurring) period of time. Moreover, even for longer-term workers, a specialized agency may be better able to identify and manage employees for

6

particular function. In addition, the employer company may legitimately seek to avoid the administrative and legal burdens of assuring compliance with a variety of regulatory requirements, leaving it to the subcontracting agency to manage those burdens.

While the language of Title VII does not address such situations directly, the courts have imported doctrines from other workplace regulations, such as wage and hour laws, to allocate liability between the contracting employer and the subcontracting agency for violations of those regulatory requirements. In the ordinary case, those doctrines assign responsibility to the agency, which is the formal contractual employer of the worker. At the same time, however, courts and regulators have crafted a "joint employer" doctrine, the purpose of which is to "prevent" the delegating company from "evading liability by hiding behind another entity, such as a staffing entity." *Butler v. Drive Auto Indus. of Am., Inc.*, 793 F.3d 404, 410 (4th Cir. 2015). In order to balance the legitimate economic reasons to permit such labor subcontracting, and to be wary of improperly attributing the mistreatment by the subcontractor agency of those workers it has selected, managed and supervised to the entity for whom the services are supplied, against the need to protect both workers and the subcontracting agency from

7

mistreatment dictated solely or jointly by the company receiving the services, the joint employer doctrine relies on the complicated multi-factorial test cited by the majority in this case. *Id.* at 414. That test makes sense in the context of cases involving discrimination or violations of other workplace standards with respect to the terms and conditions of employment, and I have no quarrel with its use in such cases.

At the same time, Title VII explicitly protects *applicants* for employment. That protection is one of the primary purposes of anti-discrimination law: to prohibit the formerly common and once entirely legal practice of employers overtly refusing to hire members of disfavored groups for all or selected functions. Applicants for employment, by definition, do not yet have an employment relationship with the entity alleged to have discriminated against them. When they are refused employment, allegedly for a discriminatory reason, determining the responsibility for the refusal should be a relatively straightforward task. Like all judicial fact-finding, that task may be difficult, given the possibilities of deceit and mutual misunderstanding that are the grist of decisions by judges or juries in determining facts. But there is not the same need to sort out the complexities of interactions in the workplace between workers and supervisors formally

employed by the subcontracting agency and the officials of the contracting employer to whom they report. There is a simple binary decision, to hire or not to hire, to accept a worker's presence or reject it. Someone, at one company or the other, is the ultimate decisionmaker in the hiring choice.

Felder alleges that he was denied credentials by USTA to work at what may have been the sole event for which he was employed by AJ Security, in retaliation for complaining about race discrimination, a protected activity under Title VII, years earlier when he had worked for USTA while employed by a different contractor. He asserts that he was hired by AJ Security, chosen by it to work at the US Open, and sent by them to USTA, that USTA rejected him, and that he was informed by AJ Security that he was rejected because he had engaged in the protected activity of complaining about alleged discrimination that had nothing to do with AJ Security, but that had taken place while he was providing services to USTA under the auspices of a different security subcontractor. If his concrete factual allegations are true, there is no reason to think that the retaliatory animus emanated from AJ Security; the facts alleged place that animus squarely with USTA.

In this context, to read Title VII as requiring Felder to plead the full scope of factors that would have created a joint employer-employee relationship with both USTA and AJ Security if Felder had been permitted to work seems strange. The majority recognizes, correctly, that nearly all of the factors it would typically consider in determining the existence of a joint employer relationship are inapplicable here, because they "presume an existing relationship between two parties . . . [and] the USTA allegedly denied Felder his credentials *before* he could start work as a temporary security guard." Op. at 20 (emphasis in original). However, instead of acknowledging the necessity of a corresponding change in the calculus of relevant factors, the majority concludes that in the context of a failure to hire claim, plaintiffs like Felder must show that "the USTA [would] have been Felder's joint employer *had* Felder worked at the U.S. Open." Op. at 22-23 (emphasis in original).

As a practical matter, that obligation would be extremely difficult for most applicants to meet.[2] A rejected applicant would be hard put to collect, in advance

---

[2] The Court acknowledges that, as an applicant who had prior experience working security for USTA through a former contractor, Felder might have such information, and remands to permit him to amend his complaint to attempt to satisfy the burden that the Court imposes on him. Op. at 31-32. An applicant without such experience would have a much harder time developing such facts. In any event, I believe that as a matter of law a

10

of discovery, evidence about who would have controlled which decisions in a hypothetical relationship that was never allowed to exist. But putting that practical objection aside, the more fundamental flaw in the majority's approach is that it chooses to rely on factors that it acknowledges are *irrelevant* to the sole decision that was made, in order to determine whether that decision was prohibited by Title VII.

That a failure-to-hire claim must be treated differently from other types of adverse employment actions *precisely* because it arises prior to the establishment of an employer-employee relationship is not a novel concept. As one district court in this Circuit has observed, a "failure-to-hire claim is distinguishable from other employment discrimination claims in that it necessarily applies in most circumstances to non-employees seeking employment positions rather than current employees." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018) (quoting *Suri v. Foxx*, 69 F.Supp.3d 467, 475–76 (D.N.J. 2014)) (emphasis added). The majority's insistence that the existence of an employer-employee relationship is a necessary element of every claim under Title VII

plaintiff asserting a claim of discriminatory refusal to hire should not bear such a burden of pleading or proof in the first place.

11

neglects to recognize a key distinction between failure-to-hire claims and other types of discrimination claims, and relies all too heavily on a body of case law developed solely in the latter context.

The majority's approach makes sense in the context of a conditions-of-employment case, in which an already-hired employee complains that he has been subjected to discriminatory terms or conditions of employment. In that setting, a court looks to the details of the tripartite relationship between the worker, his nominal employer, and the entity to which he provides services in order to figure out whether decisions ostensibly made by the subcontracting agency should be attributed to the ultimate recipient of the services. That test is appropriately difficult to meet, because it seeks to sort out what are often joint responsibilities for supervision and management of staff.

But the majority's approach makes little sense in the context of a failure-to-hire claim. Here, the relevant question in determining Title VII liability is *who is responsible for the refusal to hire*. That is not because the power to hire and fire is the dispositive factor in determining joint employer status as a general matter, but because it is the most – indeed the only – relevant factor in a failure-to-hire case. The allegations of responsibility in such a case are, as a practical matter, simple

and direct. Nor is there any policy reason to protect an employer such as USTA from the consequences of decisions for which it, on the facts alleged, is solely responsible. If USTA hired its own security guards, the Civil Rights Act would not permit it to maintain a security staff that was all-white, all-male, all-straight or all-gentile, or to refuse employment on its premises to "troublemakers" who complained of discriminatory treatment of black, female, gay, or Jewish employees. The majority finds it significant that USTA does not insist that AJ Security *fire* employees of protected groups, or not to assign them to work for other entities to whom it contracts to provide security guards. Op. at 24. But Title VII does not impose liability only on employers who seek to require *other* companies to maintain exclusionary workforces; it seeks to prevent employers from maintaining exclusionary workforces *themselves*. There is no reason to shield a company that accomplishes its biased preference not to allow disfavored groups to work for it in various capacities indirectly, by nominally delegating the hiring of those employees to another agency, and then refusing to accept those that the agency hires to work for it for discriminatory reasons.[3]

---

[3] Such indirect discriminatory practices unquestionably harm both minority workers and subcontracting agencies. Whether or not Felder himself falls into this category, it would hardly be unusual for an agency in AJ Security's position to supplement its normal workforce when supplying a significant number of workers for a temporary assignment

If it makes economic sense for USTA, which needs a large security staff only for a limited time period during which it sponsors an event catering to thousands of spectators, to delegate the hiring and supervision of those guards to a specialized contractor, there are legitimate reasons not to require it to police the hiring decisions of that subcontractor or to hold it liable for discriminatory actions taken by that contractor. But there is no plausible reason to allow an employer such as USTA to indulge its own biased preferences by purporting to outsource the hiring of security guards at its events to a contractor, while retaining the absolute and unilateral power to turn away any guards sent by the subcontractor based on prohibited grounds of discrimination or retaliation. To the extent that the goal of the joint employer doctrine is to "prevent" employers from "evading liability by hiding behind another entity, a staffing entity," *Butler*, 793 F.3d at 410, then USTA should not be able to have it both ways. If it is not to be held responsible

---

such as the US Open to recruit candidates in search of temporary, seasonal or supplemental employment, who would not have a regular position with the agency at the end of the event, or for applicants to answer advertisements for such a position because they seek a temporary assignment at such a prestigious and perhaps enjoyable event. Nor can it be questioned that contracting employers who accept only favored categories of help from subcontractors shrink the opportunities available to disfavored groups, as well as putting their subcontractors into a legally compromised position of having to discriminate among its own employees and applicants at the behest of those with whom they do business.

for AJ Security's employment decisions, those decisions must be those of the contractor. Employers cannot be permitted to replace a sign that says "No Irish need apply to work here" with one that says "No Irish will be given credentials to work here if they are hired by our security contractor and assigned to work at our premises."

The majority's conclusion here holds, in so many words, that an employer is free, as a matter of law, to decline to accept a subcontractor's assignment of an employee to work for the contracting company on the basis of race, sex, or other prohibited categories, without liability under Title VII. While the joint employer doctrine sensibly protects companies from the discriminatory employment practices of its subcontractors where the company is insufficiently involved with the conditions of employment to be reasonably held responsible for the subcontractor's acts, it makes little sense to adopt a rule that permits an employer to require its subcontractors to violate Title VII by sending it only white security guards, or non-Jewish bookkeepers, or female office temps, thus putting the subcontractor to the choice of losing the contract or violating Title VII itself by classifying its employees on the basis of race in ways that will adversely affect their employment opportunities.

Nothing in the text of the statute, or prior precedents of the Supreme Court or of this Court requires that conclusion.[4] The Court's decision today represents a policy choice to extend rules that may be appropriate to protect the right of employers to contract out responsibility for compliance with various labor laws to situations in which the employer has *not* contracted out the all-important hiring decision, but instead retains its own power to choose its workers on discriminatory grounds. That choice is incompatible with the rights Title VII was designed to protect.

I therefore respectfully dissent.

---

[4] The principal cases relied on by the majority, *Knitter v. Corvios Mil. Living*, 758 F.3d 1214 (10th Cir. 2014), and *Redd v. Summers*, 232 F.3d 933 (D.C. Cir. 2000), involve allegations of discriminatory or retaliatory *termination*. While I find those cases questionable for the same reasons discussed in this dissent, I note that termination cases, as opposed to hiring cases, do involve some of the same difficulties as terms-and-conditions cases. Termination cases and terms-and-conditions cases arise in the context of an existing employment relationship, and often grow out of the same kinds of complicated workplace dynamics. Terminations usually involve claims that the employee was discharged for workplace misconduct rather than discriminatory or retaliatory animus, and thus implicate the kinds of complex interactions in which decisions that may nominally be made by the subcontracting agency are the product of complaints by the ultimate employer and responses by the agency. The question of who is responsible for supervising the employee's performance and the other factors relevant to the joint employer doctrine may therefore well be relevant in that context. But as this case illustrates, the fact question raised in failure-to-hire cases will generally be cleaner.